UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NATHALIE PINTO-THOMAZ,

                        Plaintiff,                          15-cv-1993 (PKC)

        -against-                              MEMORANDUM AND ORDER


PAULA CUSI,

                        Defendant.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Defendant Paula Cusi is a citizen of Spain and Mexico, with residences in Geneva
and the Principality of Monaco.  She a patron of the arts in New York City and elsewhere, and
maintains an extensive private collection that includes rare jewels and antiquities.

        In 2011 and 2012, she purchased from plaintiff Nathalie Pinto-Thomaz three
pieces of jewelry: a 56.01-carat emerald ring for $940,000 (the "Emerald Ring"), an antique
emerald-and-pearl necklace for $6.8 million (the "Antique Necklace"), and a 43.75-carat
Burmese ruby for $8.5 million (the "Burmese Ruby").  A few years later, after consultations with
Swiss gem experts, Cusi informed Pinto-Thomaz that the items had flaws that made them
significantly less valuable than their purchase prices.  Cusi proposed to return the items to Pinto-
Thomaz.  Their ensuing disagreements led to this lawsuit.

        Invoking diversity jurisdiction, plaintiff Nathalie Pinto-Thomaz brings two claims
against Cusi sounding in contract.  The specific performance claim alleged in Count One relates
to a purported settlement agreement reached in late 2014 with plaintiff's New York lawyer.  The
breach of contract claim alleged in Count Two relates to the 2012 sale of the Burmese Ruby in
Monaco.

Cusi argues that she is not subject to personal jurisdiction in the State of New York, and moves to dismiss pursuant to Rule 12(b)(2), Fed. R. Civ. P.  Cusi also moves to dismiss for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P.  No jurisdictional discovery has taken place.

For the reasons explained, this Court concludes that Pinto-Thomaz has not made out a prima facia case that New York has general personal jurisdiction over Cusi pursuant to CPLR 301.  Pinto-Thomaz has made out a prima face case that New York has specific personal jurisdiction under its long-arm statute, CPLR 302(a)(1), as to the claim for specific performance alleged in Count One.  However, because the Complaint does not plausibly allege a claim for relief, Count One is dismissed.  As to Count Two, Pinto-Thomaz has not made out a prima facie case of specific personal jurisdiction as to her breach of contract claim relating to the Burmese Ruby transaction, and Count Two is dismissed for lack of personal jurisdiction.

BACKGROUND.

A.  The Parties' Backgrounds and Cusi's Purchase of the Jewelry.

Cusi is a citizen of Spain and Mexico, and is not domiciled in the United States.  (Compl't ¶ 8.)  She maintains her primary residence in Monaco, and has a second residence in Geneva, Switzerland.  (Cusi Dec. ¶ 3.)  Pinto-Thomaz is a citizen of New York.  (Compl't ¶ 7.)

The Metropolitan Museum of Art has described Cusi as "a collector, publisher and initiator of art exhibitions" who has broadened public access the Mexican art.  (Compl't ¶ 9.)  Among other things, she collects gems and antiquities.  (Compl't ¶¶ 12-13.)  Over a period of approximately 35 years, Pinto-Thomaz advised Cusi on her purchases, and Cusi states that "[u]ntil in or around May 2014 I had complete faith in Ms. Pinto-Thomaz's integrity and

expertise concerning rare gems and jewelry."  (Cusi Dec. ¶ 11.)  Cusi describes Pinto-Thomaz as having been "a close personal friend and advisor of mine."  (Cusi Dec. ¶ 11.)

In 2011, Cusi made two jewelry purchases arranged by Pinto-Thomaz, both of which occurred in New York.  On February 15, 2011, she purchased the Emerald Ring in New York for $940,000.  (Cusi Dec. ¶ 12 & Compl't ¶¶ 16-17.)  On September 12, 2011, she purchased the Antique Necklace in New York for $6.8 million.  (Cusi Dec. ¶ 13 & Compl't ¶ 22.)  Both items were sold with invoices issued under the name Sky Channel Investments, Ltd. ("Sky Channel"), a business with a Hong Kong address, but Cusi states that the "purchase transactions were through Ms. Pinto-Thomaz . . . ."  (Cusi Dec. ¶¶ 12-13 & Exs. 4-5.)  Pinto-Thomaz states that she is the exclusive owner of Sky Channel, and never held herself out as the agent of any other seller.  (Pinto-Thomaz Aff. ¶¶ 6, 9.)

On June 8, 2012, Cusi bought the Burmese Ruby for $8.5 million, with an invoice issued by Red Valley, Ltd. ("Red Valley").  (Cusi Dec. ¶ 15 & Compl't ¶ 25.)  Red Valley has a Singapore address.  (Cusi Dec. ¶ 15.)  As with Sky Channel, Pinto-Thomaz states that she is the exclusive owner of Red Valley, and never held herself out as the agent of any other seller. (Pinto-Thomaz Aff. ¶¶ 7, 9.)  Cusi purchased the Burmese Ruby in Monaco, and has stored it in Geneva ever since.  (Cusi Dec. ¶ 15 & Compl't ¶¶ 25-26.)

B.  Cusi's Discovery of Purported Flaws in the Gems.

In May and June of 2014, Cusi arranged for a valuation of the Emerald Ring. (Cusi Dec. ¶ 16.)  Gem experts in Geneva informed her that the Emerald Ring had been enhanced with an artificial resin, and told her that the resin had a material adverse effect on the gem's value.  (Cusi Dec. ¶ 16.)  Cusi discussed her concerns with Pinto-Thomaz, who accepted the return of the Emerald Ring for a full credit of $940,000.  (Cusi Dec. ¶ 16 & Compl't ¶ 21.)

Cusi then took the Antique Necklace and the Burmese Ruby to experts at the Swiss Gemological Institute and Christie's auction house.  (Cusi Dec. ¶ 18.)  According to Cusi, the examinations revealed that certifications provided by Pinto-Thomaz were inaccurate, and that the two items were worth "a fraction" of their purchase prices.  (Cusi Dec. ¶ 18.)  At that point, Cusi refused to pay the outstanding balance on the Burmese Ruby.  (Cusi Dec. ¶ 18; Compl't ¶ 32.)

On November 13, 2014, Cusi's attorney, who was located in California, sent a letter to Pinto-Thomaz's attorney, who was located in New York, recounting Cusi's purchase of the Emerald Ring, the Antique Necklace and the Burmese Ruby.  (Compl't ¶ 15 & Ex. 3.)  The letter stated that Cusi had paid Pinto-Thomaz $12,856,126 for the three items, and acknowledged that she still owed an outstanding balance of $2,383,874.  (Compl't ¶ 15 & Ex. 3.)

In a letter of December 10, 2014, Cusi's attorney in California again wrote to Pinto-Thomaz's attorney in New York with the following proposal: that Pinto-Thomaz retain the $12,856,126 that Cusi had already paid her; that Cusi transfer legal title to the Antique Necklace, Emerald Ring and Burmese Ruby to Pinto-Thomas; and that Pinto-Thomaz thereafter own all three items.  (Compl't ¶ 35 & Ex. 8.)  Pinto-Thomaz's lawyer accepted the offer in an email, and in their ensuing exchanges, the attorneys raised differing views on where the items would be retrieved and the necessity of certain import and export documentation.  (Compl't ¶¶ 39-45 & Ex. 9; Fleischer Dec. Ex. A.)  The Complaint characterizes these attorney emails as a complete and binding "settlement agreement."  (Compl't ¶ 42.)

According to Pinto-Thomaz, Cusi then breached the "agreement" by failing to return the items and transfer legal title to her.  (Compl't ¶ 46.)  Count One of her Complaint seeks specific performance as to the return from Cusi of the Antique Necklace and the Burmese

Ruby.  (Compl't ¶¶ 47-54.)  Count Two alleges breach of contract in the alternative to specific

performance, and seeks $2,443,874 in damages as to the Burmese Ruby.  (Compl't ¶¶ 55-62.)

C.  Cusi's Contacts with the State of New York.

This action was commenced on March 18, 2015.  (Docket # 1.)  Cusi states that

she has not been physically present in New York since in or about November 2013, and that

during 2014 and 2015, she has not leased or owned any real property in the state, or maintained a

New York bank account or brokerage account.  (Cusi Dec. ¶¶ 4-8.)  As will be discussed in

greater detail, Cusi's contacts with New York involve activities related to the art world,

including both philanthropic work and the sale or purchase of items through Manhattan galleries.

There is no dispute that the Antique Necklace and the Emerald Ring were both

purchased in New York.  (See, e.g., Compl't ¶¶ 4-5, 16, 22; Cusi Mem. at 11-12; Cusi Reply at

6.)  It is also undisputed that Cusi's attorney in California directed certain e-mail

communications to Pinto-Thomaz's attorney in New York.  (Fleischer Dec. Ex. A; Cusi Dec. Ex.

8.)

RULE 12(b)(2) STANDARD

On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the

burden of demonstrating that the court has personal jurisdiction over the defendant.  Penguin

Grp. (USA) Inc. v. Am. Buddha, 609 F.3d 30, 34 (2d Cir. 2010).  The nature of the plaintiff's

obligation "varies depending on the procedural posture of the litigation."  Dorchester Fin. Secs.,

Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013).  If the court considers only the

pleadings and affidavits on the motion to dismiss, "the plaintiff need only make a prima facie

showing of personal jurisdiction over defendant."  CutCo Industries, Inc. v. Naughton, 806 F.2d

361, 364 (2d Cir. 1986).  On a motion pursuant to Rule 12(b)(2), courts may rely upon materials outside the pleadings.  See DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001).

Personal jurisdiction may be exercised over any defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Rule 4(k)(1)(A), Fed. R. Civ. P.  If plaintiff is able to establish a factual predicate for jurisdiction under the laws of the forum state – here, New York – then the court must consider whether the exercise of jurisdiction violates due process.  Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 94 (2d Cir. 2000).

DISCUSSION.

I.   New York Does Not Have General Personal Jurisdiction Over Cusi Under CPLR 301.

The Complaint expressly invokes New York's long-arm statute, CPLR 302, as a basis for exercising personal jurisdiction over Cusi, but it also separately alleges that "[u]pon information and belief, Defendant has transacted, and regularly transacts, business in New York . . . ."  (Compl't ¶¶ 3, 5.)  The parties dispute whether Cusi is subject to general personal jurisdiction based on her activities in New York.

New York's general personal jurisdiction statute provides that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore."  CPLR 301.  Traditionally, CPLR 301 has allowed New York courts to exercise general personal jurisdiction over individuals only if they are domiciled in New York, have a physical presence in New York, or consent to New York's exercise of jurisdiction.  See, e.g., Pichardo v. Zayas, 122 A.D.3d 699, 702 (2d Dep't 2014) (collecting cases); Nilsa B. B. v. Clyde Blackwell H., 84 A.D.2d 295, 303 (2d Dep't 1981).

At times, however, New York courts have exercised general personal jurisdiction over individuals "doing business" in the state, a mode of analysis historically applied only to foreign corporations.  See, e.g., Hardware v. Ardowork Corp., 117 A.D.3d 561, 561 (1st Dep't 2014) (exercising general personal jurisdiction over Connecticut defendant because his "long-term employment" in New York amounted to "doing business" in the state); ABKCO Indus. v Lennon, 52 A.D.2d 435, 440 (1st Dep't 1976) (concluding that Ringo Starr's "composing activities, which he has exploited in the United States through attorneys and accountants whom he has retained in New York on a continuing basis, constitute doing business in New York."); see also Laufer v. Ostrow, 55 N.Y.2d 305, 313 (1982) (assuming without deciding "that an individual who is in fact doing business so as to be present within the State is subject to jurisdiction.").

Like the New York Court of Appeals in Laufer, for the purposes of this motion, this Court assumes, without deciding, that an individual "doing business" in New York may be subject to general jurisdiction.  This requires the plaintiff to make a prima facie showing that the defendant is "doing business" in New York through evidence of "a voluntary, continuous and self-benefitting course of conduct . . . ."  Hardware, 117 A.D.3d at 561.  "While an examination of the various factual permutations which have been held to constitute 'doing business' is not necessary to our decision here, what is essential is to note that a fundamental sine qua non of all such holdings is the requirement that defendant be shown to have been 'doing business' at the time when the action was commenced."  Lancaster v. Colonial Motor Freight Line, Inc., 177 A.D.2d 152, 156 (1st Dep't 1992).  The First Department described this as "crucial to the concept of 'presence,'" because the defendant "must be 'here' and therefore subject to the State's power, at the very time of the exercise of the jurisdiction itself."  Id.

Cusi has filed a declaration that purports to describe her most recent contacts with New York.  She asserts that she has not been physically present in the state since in or about November 2013.  (Cusi Dec. ¶ 4.)  She states that during 2014 and 2015, she has not owned or leased any real property in New York, solicited or engaged in business in the state, or maintained a telephone listing, bank account or brokerage account based in New York.  (Cusi Dec. ¶¶ 5-8.)

Cusi lists seven transactions that she made through New York art galleries from 2013 through 2015.  In 2013 or 2014, she sold paintings by Lee Krasner and David Hockney to a gallery.  (Cusi Dec. ¶ 10.)  In 2014, she sold two sculptures and purchased one glazed ceramic artwork through that same gallery.  (Cusi Dec. ¶ 10.)  In 2015, she sold one painting to a gallery, and sold a sculpture "through a well-known auction house in New York."  (Cusi Dec. ¶ 10.)

Cusi states that throughout 2014 and 2015, she has been an honorary trustee of the Metropolitan Museum of Art (the "Met").  (Cusi Dec. ¶ 9.)  She states that as an honorary trustee, she is not required to have a physical presence in New York, and has not attended any Met-related meeting in the state during 2014 and 2015.  (Cusi Dec. ¶ 9.)

Pinto-Thomaz sets forth several additional facts that she claims support the exercise of general personal jurisdiction over Cusi.  On November 10, 1998, the Met issued a news release announcing that Cusi had been elected a trustee of the museum, which noted that she "has been involved with" the museum for a decade.  (Fensterstock Aff. Ex. 2.)  Pinto-Thomaz asserts, upon information and belief, that Cusi served as a trustee of the Met from 1998 to 2013.  (Fensterstock Aff. Ex. 6.)  She cites Cusi's numerous other roles at the Met, including past service on the museum's Visiting Committee for 20th Century Art; work organizing the Met's annual Costume Gala in 1998; service on the Met's Nineteenth-Century, Modern and Contemporary Art Committee in 2005 and from 2009 to 2011, and on the museum's Modern and

Contemporary Art Committee from 2012 to at least 2014; and her sponsorship of Met exhibitions, "including the *Wall of Light* series by celebrated artist Sean Scully" in 2006, and *Francis Bacon: A Centenary Retrospective* in 2009.   (Fensterstock Aff. Exs. 2-5, 7-8).   Between 2009 and 2014, Cusi donated at least $1,000 to the Met each year.   (Fensterstock Aff. Ex. 9.) The Met purchased or borrowed two works of art from Cusi in 2014 and 2015.   (Fensterstock Aff. Exs. 11 & 12.)

In addition to her Met-related activities, Cusi sponsored an exhibition at the Museum of Art and Design in New York from 2012 to 2013.   (Fensterstock Aff. Ex. 13.)   She serves on the board of advisors for the Vendome Prize, an international competition for pianists between the ages of 18 and 28 that is organized by a New York-based foundation.   (Fensterstock Aff. Exs. 14-16.)   Cusi sits on the Sotheby's Council and the International Committee of Venetian Heritage, which both maintain New York offices.   (Fensterstock Aff. Exs. 18-19.)

These contacts are insufficient to establish a prima facie case that Cusi is present and doing business in New York "not occasionally or casually, but with a fair measure of permanence and continuity."  Laufer, 55 N.Y.2d at 310.   Much of the activity cited by Pinto-Thomaz predates by several years the commencement of this action, and therefore does not go to whether Cusi was "doing business" in New York at the time this action was filed.  Lancaster, 177 A.D.2d at 156 (presence is assessed from the date of action's commencement).

To the extent that Pinto-Thomaz relies on Cusi's involvement in charity boards, New York courts have concluded that CPLR 301 applies to persons acting only in their individual capacities, and that their activities on behalf of an employer or corporation will not support the exercise of personal jurisdiction.  See, e.g., Brinkmann v. Adrian Carriers, Inc., 29 A.D.3d 615, 617 (2d Dep't 2006) ("An individual cannot be subject to jurisdiction under CPLR

301 unless he is doing business in New York as an individual rather than on behalf of a corporation."); Laufer, 55 N.Y.2d at 313 (no personal jurisdiction over employee or agent "unless he is doing business in our State individually.").  To the extent that Cusi has participated in arts organizations with New York offices or facilities, any activities related thereto would be on behalf of those organizations, and not undertaken in her individual capacity.  Moreover, there is no evidence in the record that Cusi's involvement with the Met and the other arts organizations has caused her to be physically present in New York for the period immediately preceding or following the commencement of this action.  As noted, Cusi has stated that she has not been present in New York since November 2013.  (Cusi Dec. ¶ 4.)

Cusi's most recent New York activities include the transactions in which she bought and sold art through New York galleries, as well as the apparent sale or loan of two works to the Met.  (Cusi Dec. ¶ 10; Fensterstock Aff. Exs. 11 & 12.)  Her sale and purchase of these items were occasional, discrete and individual transactions.  They do not have the permanence and continuity that amount to "doing business" under CPLR 301.  See, e.g., Sikhs for Justice v. Nath, 850 F. Supp. 2d 435, 443-45 (S.D.N.Y. 2012) (Sweet, J.) (no personal jurisdiction over defendant from India who had no office, bank accounts, property or employees in New York; had visited New York approximately seven times in six years; and had a New York publisher but received no book royalties); Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC, 2012 WL 204102, at *3 (S.D.N.Y. Jan. 24, 2012) (Holwell, J.) (looking to whether defendant company maintained an office, solicited business, held bank accounts or other property, or had employees or agents in New York);  First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 393 (S.D.N.Y. 2002) (Kaplan, J.) (no personal jurisdiction over individual defendant who "at best . . . engaged in seven or eight New York-

related business transactions and made eight business trips to New York in the past twenty years," and who was vaguely alleged to have directed business activities in New York).

Lastly, Cusi has brought at least one lawsuit in New York.  In February 2010, she filed a complaint in the Supreme Court of the State of New York, New York County, alleging breach of contract and negligence.  See Cussi v. Edelman Arts, Inc., et al., Index No. 600032/2010 (N.Y. Sup. Ct. N.Y. Cnty.) (the "Edelman Action") (Fensterstock Aff. Ex. 23). Cusi sued an Upper East Side art dealer over her $250,000 purchase of a sculpture by the artist Roberto Matta because, upon delivery to Cusi's apartment in Paris, her assistant allegedly discovered that two arms of the sculpture had broken off during shipping.  (Edelman Compl't ¶¶ 4, 16.)  Cusi brought claims against the dealer for breach of contract and negligence.  (Edelman Compl't ¶¶ 24-48.)  The record is silent as to whether additional proceedings occurred in that case, or whether any party filed a request for judicial intervention.

But "[a] party's appearance as petitioner in one proceeding does not necessarily subject it to personal jurisdiction in another proceeding, even in the same court.  Nor is the mere filing of a lawsuit in New York considered to be 'doing business' in the state."  Greatship (India) Ltd., 2012 WL 204102, at *4 (internal citations omitted); accord Gulf Ins. Co. v. Caldor Corp., 2006 WL 1586571, at *4 (S.D.N.Y. June 9, 2006) (Stanton, J.) (participation in previous, unrelated bankruptcy proceeding did not establish defendant's general personal jurisdiction in New York).  Cusi's earlier role as a plaintiff in the Edelman Action does not allow for general personal jurisdiction over her at the time that this action was filed.

In light of the foregoing, Pinto-Thomaz has not made out a prima facie case that Cusi is subject to general personal jurisdiction in New York.

II. New York Has Long-Arm Jurisdiction over Cusi as to the Specific
Performance Claim, Which Is Dismissed Pursuant to Rule 12(b)(6).

A. New York's Long-Arm Statute.

"[A] federal court generally may not rule on the merits of a case without first

determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)

and the parties (personal jurisdiction)." Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,

549 U.S. 422, 430-31 (2007). New York's long-arm statute, CPLR 302(a)(1), states: "As to a

cause of action arising from any of the acts enumerated in this section, a court may exercise

personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or

through an agent: (1.) transacts any business within the state or contracts anywhere to supply

goods or services in the state . . . ."

"In order to satisfy the overriding criterion necessary to establish a transaction of

business within the meaning of CPLR 302(a)(1), a non-domiciliary must commit an act by which

it purposefully avails itself of the privilege of conducting activities within New York." Paterno

v. Laser Spine Inst., 24 N.Y.3d 370, 377 (2014) (quotation marks omitted). "Essential to the

maintenance of a suit against a nondomiciliary under CPLR 302 (subd [a], par 1) is the existence

of some articulable nexus between the business transacted and the cause of action sued upon."

McGowan v. Smith, 52 N.Y.2d 268, 272 (1981); see also Wilson v. Dantas, 128 A.D.3d 176, 181

(1st Dep't 2015) ("'By this single act statute . . . proof of one transaction in New York is

sufficient to invoke jurisdiction . . . so long as the defendant's activities here were purposeful and

there is a substantial relationship between the transaction and the claim asserted.'") (quoting

Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71 (2006)). "Whether a

defendant has transacted business within New York is determined under the totality of the

circumstances . . . ." Paradigm Mktg. Consortium, Inc. v. Yale New Haven Hosp., Inc., 124

A.D.3d 736, 737 (1st Dep't 2015).  "Determining whether long-arm jurisdiction exists under the 'transacts business' provision of CPLR 302(a)(1), therefore, is a two-pronged inquiry: a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether the cause of action arises from such a business transaction."  Wilson, 128 A.D.3d at 181.  Both prongs must be satisfied for New York to exercise personal jurisdiction, which is limited to claims that arise from a New York transaction.  Id. at 182.

When jurisdiction is premised on the enforcement of a contract, the defendant must have engaged in "purposeful activity in New York directed toward and resulting in the establishment of a contractual relationship . . . ."  George Reiner & Co. v. Schwartz, 41 N.Y.2d 648, 654 (1977).  Communications directed into New York will confer jurisdiction "if they were related to some transaction that had its 'center of gravity' inside New York, into which a defendant 'projected [her]self.'"  Maranga v. Vira, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (Sand, J.).

Where, as here, jurisdiction is premised on the actions of the defendant's agent, the plaintiff must show that the agent "engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the [defendant]", and that the defendant "exercised some control over [the agent] in the matter."  Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 467 (1988).

If the defendant's transaction of business in New York satisfies section 302(a)(1), the Court must separately determine whether the exercise of jurisdiction is consistent with due process.  To satisfy due process, the defendant must "have certain minimum contacts with" New York to ensure that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. &

Placement, 326 U.S. 310, 316 (1945).  The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," but the "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties."  Walden v. Fiore, 134 S. Ct. 1115, 1122, 23 (2014).  If a defendant has purposely availed herself of activities within New York, sufficient to receive the benefits and protections of its laws, the exercise of personal jurisdiction is consistent with the "minimal contacts" required to satisfy due process.  Wilson, 128 A.D.3d at 182.

      B.  Cusi's Communications and Her Purchase of the Antique Necklace Amount to the Transaction of Business in New York that Gives Rise to the Claim in Count One.

Pinto-Thomaz argues that New York has long-arm jurisdiction over Cusi because Cusi's communications to New York resulted in the formation of the purported "settlement agreement," and because the Antique Necklace and Emerald Ring were acquired in New York. (Compl't ¶¶ 33-45.)  Solely for the purposes of determining long-arm jurisdiction, the Court assumes, for the sake of argument, that the e-mail exchange between Cusi's attorney in California and Pinto-Thomaz's attorney in New York formed an enforceable agreement.

On November 13, 2014, Cusi's attorney, located in California, wrote to Pinto-Thomaz's personal home and e-mail address in New York, identifying himself as Cusi's "special litigation counsel."  (Compl't Ex. 3.)  He stated that he was contacting her "regarding your wrongful and tortious conduct designed to cause substantial financial harm to Mrs. Cusi." (Compl't Ex. 3.)  The letter noted Cusi's purchases of the Antique Necklace, Emerald Ring and Burmese Ruby, and demanded a refund of $12,856,126, reflecting Cusi's payment for the items. (Compl't Ex. 3.)

In December 2014, Cusi's attorney located in California exchanged e-mails with Pinto-Thomaz's attorney located in New York.  (Cusi Dec. Ex. 8, 9; Compl't Ex. 9.)  Cusi's attorney initiated the exchange in a letter attached to an e-mail dated December 10, 2014, in which he stated that he had "been instructed by my client to resolve the dispute with your client, and anyone else claiming an interest in this deal . . . ."  (Cusi Dec. Ex. 8.)  Cusi's California attorney proposed that Pinto-Thomaz retain the $12,856,126 already paid by Cusi; that Cusi return the Burmese Ruby and Antique Necklace to Pinto-Thomaz; and that Pinto-Thomaz keep the items, sell them for her own account, or return them to any partners.  (Cusi Dec. Ex. 8.)  Cusi's offer also proposed to "transfer legal title" to Pinto-Thomaz.  (Cusi Dec. Ex. 8.)  The letter then stated, "If your client agrees to the foregoing, please confirm via email, and I will prepare a formal settlement agreement.  Once the settlement agreement is signed, your client is free to retrieve the Jewelry."  (Cusi Dec. Ex. 8.)

Pinto-Thomaz's attorney replied that same day, stating that "this sounds acceptable with the caveat that the settlement is with prejudice and the jewelry is delivered to my office to ensure everything is done correctly."  (Compl't Ex. 9.)  In a December 15 e-mail, Cusi's attorney asked Pinto-Thomaz to provide legal authorizations for the import and export of the jewelry.  (Compl't Ex. 9.)  Pinto-Thomaz's attorney replied in part, "In the alternative, we can arrange for you to leave it at the free port in Geneva and we will take care of it."  (Fleischer Dec. Ex. A.)  On December 19, Cusi's attorney wrote that "your responses concern me" as to the import/export documentation.  (Fleischer Dec. Ex. A.)  Pinto-Thomaz's attorney replied, and explained circumstances involving the import/export documentation, concluding, "As I mentioned, to alleviate any concerns you may have, we can make arrangements for you to deliver the jewelry at the free port in Geneva."  (Fleischer Dec. Ex. A.)

Based on this record, Pinto-Thomaz has made out a prima facie case that Cusi (located in Geneva) acting through her agent (located in California) projected herself into New York for the purpose of effectuating the "settlement agreement" and arranging for the return of the jewels to Pinto-Thomaz.  Two key facts support this conclusion: Cusi initiated the transaction by making the first communications concerning the "agreement," and one of the items in dispute – the Antique Necklace – was purchased in New York.  Because Cusi initiated the chain of communications with Pinto-Thomaz facilitating the purported "contract," this is not an instance where a defendant is subject to personal jurisdiction based on the defendant's unilateral activities.  Courts typically distinguish instances where communications were initiated by the foreign defendant from those in which a New York party initiated the transaction.  See, e.g., Mortg. Funding Corp. v. Boyer Lake Pointe, LC, 379 F. Supp. 2d 282, 287-88 (E.D.N.Y. 2005) (declining to exercise jurisdiction over foreign defendant based on the "[s]ignificant" fact that underlying communications were initiated by the New York party); Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP, 2015 WL 5751252, at *5 (S.D.N.Y. Sept. 30, 2015) ("[O]ut-of-state communications can create a sufficient basis for Section 302(a)(1) jurisdiction if the defendant takes some initiative in creating the connection with a New York party in the first place.") (Furman, J.).

Cusi's acquisition of the Antique Necklace in New York and her initiation of communications to New York support a prima facie case that she projected herself into the state and had an ongoing continuing relationship with Pinto-Thomaz that was based in New York.  See Wilson, 128 A.D.3d at 183-84 (discussing "purposeful acts" preliminary and subsequent to contract's execution as evidence of "a continuing relationship between the parties.").

The Complaint's claim for specific performance arises from Cusi's contacts with New York, and there is an articulable nexus between the parties' transaction and Pinto-Thomaz's claim.  Cusi's offer, communicated into New York, proposed to "transfer legal title" to Pinto-Thomaz in New York, including title to one item that Cusi purchased in New York.  "Accordingly, the plaintiff['s] claim was not 'too attenuated' from the transaction, or 'merely coincidental' with it."  Wilson, 128 A.D.3d at 185.  Viewed in their totality, Cusi's actions are sufficient for New York to exercise personal jurisdiction over her.

C.   The Exercise of Personal Jurisdiction over Cusi Satisfies Due Process.

The Court also concludes that Cusi has minimum contacts with New York sufficient to satisfy the due process requirement.  The record indicates that Cusi is a highly sophisticated international art collector, who knowingly purchased the Antique Necklace in New York and initiated negotiations for its return.  See Deutsche Bank Sec., Inc., 7 N.Y.3d at 71-72 (as an experienced and sophisticated securities buyer, defendant could reasonably expect to defend his actions in New York).  "So long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there, due process is not offended if that party is subjected to jurisdiction even if not 'present' in that State."  Kreutter, 71 N.Y.2d at 466.  Cusi purchased the Antique Necklace in New York, directed settlement communications to New York and proposed to transfer title in the jewelry to New York.  She therefore had the requisite minimal contacts with New York, and reasonably could be expected to defend her actions here.

For the foregoing reasons, this Court may exercise personal jurisdiction over Cusi on Count One pursuant to New York's long-arm statute, CPLR 302(a)(1).

D.  The Complaint Does Not Plausibly State a Claim for Specific Performance.

However, having concluded that Cusi is subject to personal jurisdiction in New York, Count One of the Complaint is dismissed for failure to state a claim for specific performance.

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them.  Id.  Instead, the Court must examine only the well pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SB, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v.. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court may "consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference . . . .'"  Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (quoting Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)).

"The elements of a cause of action for specific performance of a contract are that the plaintiff substantially performed its contractual obligations and was willing and able to perform its remaining obligations, that defendant was able to convey the property, and that there was no adequate remedy at law."  EMF Gen. Contracting Corp. v. Bisbee, 6 A.D.3d 45, 51 (1st Dep't 2004).  To state a claim for specific performance, a plaintiff must plausibly allege the

existence of a complete and enforceable contract.  See, e.g., Pfeifer v. Groisman, 123 A.D.3d 684, 684-85 (2d Dep't 2014); Keystone Hardware Corp. v. Tague, 246 N.Y. 79, 84 (1927).  If the specific performance claim does not involve real property, the plaintiff must "set forth nonconclusory allegations as to why an award of damages would be inadequate."  Emigrant Bank v. UBS Real Estate Sec., Inc., 49 A.D.3d 382, 385 (1st Dep't 2008).

        "To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.  That meeting of the minds must include agreement on all essential terms."  Kowalchuk v. Stroup, 61 A.D.3d 118, 121 (1st Dep't 2009).  "As a general rule, in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal."  Id. at 122 (quotation marks omitted).  In determining whether the parties have reached an enforceable agreement absent a final, written contract, courts look to (1) whether there has been an express reservation of the right not to be bound, absent a writing, (2) partial performance, (3) whether all terms have been agreed upon and (4) "whether the agreement at issue is the type of contract that is usually committed to writing."  Id. at 123 (quotation marks omitted).  An unsigned contract may be enforceable if there is objective evidence that the parties intend its terms to be binding. Id. at 125.

        Drawing every inference in favor of Pinto-Thomaz, the Complaint and the documents integral thereto do not plausibly allege that the attorney e-mails formed a contract that can be enforced through specific performance.

        First, Pinto-Thomaz's attorney accepted Cusi's initial proposal with qualification, stating that acceptance of the offer came "with the caveat that the settlement is with prejudice and the jewelry is delivered to my office to ensure everything is done correctly."  (Fleischer Dec.

Ex. A.)  He later offered to retrieve the items in Geneva, but Cusi's attorney requested documentation related to the items' import and export, and the delivery "caveat" raised by Pinto-Thomaz's attorney was never resolved.  (Id.)  Pinto-Thomaz's acceptance of the proposal therefore was not "clear, unambiguous and unequivocal."  Kowalchuk, 61 A.D.3d at 122.

Second, because the parties did not reach agreement as to the transfer of the items, the Complaint does not plausibly allege that the parties had agreed upon "all essential terms."  Id. at 121.  The e-mails that the Complaint alleges to be a "settlement agreement" do not reflect a meeting of the minds on the transfer of the jewelry, which is an essential term of the contract.

Third, Cusi's attorney repeatedly stated that the terms of the settlement must be memorialized in a written, executed contract.  Cusi's initial proposal, as attached in the December 10, 2014 e-mail, asked Pinto-Thomaz's attorney to "confirm via e-mail" his client's acceptance of the proposed agreement, after which Cusi's attorney "will prepare a formal settlement agreement.  Once the agreement is signed, your client is free to retrieve the Jewelry." (Cusi Dec. Ex. 8; emphasis added.)  In a December 19, 2014 e-mail, Cusi's attorney stated, "First, no settlement has been or will be concluded until your client, all her partners and affiliates on the jewelry deals, and my client have signed an appropriate, formal settlement agreement." (Fleischer Dec. Ex. A.)  Pinto-Thomaz's attorney replied, "I understand your statement about having a written settlement agreement, which I am waiting for."  (Fleischer Dec. Ex. A.) Because Cusi's attorney expressly stated that no agreement would be reached until the terms had been memorialized in an executed contract, and Pinto-Thomaz's attorney acknowledged that statement, this is not, as Pinto-Thomaz argues, an instance where the parties intended to be bound without the existence of a formal agreement.  See, e.g., Flores v. Lower E. Side Serv. Ctr.,

Inc., 4 N.Y.3d 363, 369 (2005) ("[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound.").

For the foregoing reasons, the Complaint does not plausibly allege the existence of a contract that is enforceable through the remedy of specific performance.  Count One of the Complaint is therefore dismissed.

### III. Because Count Two Involves a Monaco Transaction, this Court Does Not Have Long-Arm Jurisdiction over Cusi as to the Breach of Contract Claim.

When a complaint asserts specific personal jurisdiction, "a plaintiff must establish the court's jurisdiction with respect to each claim asserted."  Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original); accord First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 397 (S.D.N.Y. 2002) ("[I]t is important to remember that a plaintiff must secure personal jurisdiction over a defendant with respect to each claim he or she asserts.") (Kaplan, J.) (quotation marks omitted; emphasis in original).

Count Two alleges that Cusi "has materially breached the contract by failing to pay the due and outstanding balance of $2,443,874 that Defendant owes to Plaintiff."  (Compl't ¶ 61.)  The Complaint alleges only that Cusi breached "the contract" by failing to pay the amount due, and does not cite to the so-called "settlement agreement" referenced elsewhere throughout the pleading.  (Compl't ¶ 61.)  Similarly, although the text of Count Two does not specify that the balance relates exclusively to the Burmese Ruby, the preceding allegations and the record submitted by the parties establish that the unpaid balance relates exclusively to the Burmese Ruby.  Specifically, a document dated September 3, 2014, labeled "Pending Invoice" and sent

from Red Valley, Ltd. in Singapore to Cusi in Geneva, stated that $2,383,470 remained unpaid by Cusi for the purchase of the Burmese Ruby.[1]  (Cusi Dec. Ex. B.)

According to the Complaint, Cusi "purchased the Burmese Ruby in Monaco" for $8,500,000 on June 8, 2012.  (Compl't ¶ 26 & Exs. 6-7.)  Pinto-Thomaz's attorney stated in a December 19, 2014 e-mail: "The ruby was purchased by my client in Monaco and sold by her in Monaco."  (Fleischer Dec. Ex. A.)  Cusi states that the Burmese Ruby is currently stored in Geneva.  (Cusi Dec. ¶ 15.)  In her opposition memo, Pinto-Thomaz does not address Cusi's arguments directed toward jurisdiction over the purchase of the Burmese Ruby.  Thus, any contract for Cusi's purchase of the Burmese Ruby was not entered into as part of a New York transaction and does not have a New York nexus.  Count Two does not arise out of the transaction of business in New York.

Because Pinto-Thomaz has not made out a prima facie case of personal jurisdiction as to Count Two, Cusi's motion to dismiss pursuant to Rule 12(b)(2) is granted.

CONCLUSION

The Court has personal jurisdiction over the defendant as to Count One, which is dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. This Court does not have personal jurisdiction over the defendant as to Count Two.  Defendant's motion to dismiss is GRANTED with prejudice as to Count One and without prejudice as to Count Two.[2]  The Clerk is directed to terminate the motion.  (Docket # 16.)

---

[1] The Complaint seeks $2,443,874 in damages, which it states reflects the jewelry's full purchase price of $16,240,000, less Cusi's payment of $12,856,126 and Pinto-Thomaz's refund of $940,000 for the Emerald Ring. (Compl't ¶ 31.)
[2] Plaintiff has not sought leave to re-plead in the event that Count One is dismissed for failure to state a claim.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
November 24, 2015